## COMMONWEALTH OF PENNSYLVANIA,
### Appellee,

v.

## Bernard LAMBERT, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 20, 2001.
Filed March 22, 2002.

---

William T. Cannon, Philadelphia, for appellant.

Anjali Prasad, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before: DEL SOLE, P.J., CAVANAUGH, JOHNSON, HUDOCK, JOYCE, STEVENS, MUSMANNO, ORIE MELVIN, and LALLY–GREEN, JJ.

OPINION BY LALLY–GREEN, J.

¶ 1 Appellant, Bernard Lambert, appeals from the judgment of sentence of life in prison following his conviction by a jury

of second-degree murder, burglary, and criminal conspiracy. Appellant's convictions stem from an incident which occurred on January 20, 1997, at 5146 Funston Street, Philadelphia, Pennsylvania, when Aquil Tillman, Co–Defendant, shot and killed Ann Marie Thomas and wounded her fifteen-year-old daughter, Khadijah Freeman. We affirm.

¶ 2 The trial court found the following facts:

[Co–Defendant] was a PCP drug user, who has a long history of mental health problems and drug use. This defendant, [Appellant], was his close friend who frequently drove him various places including to get medicine for his mental health disorders.

[Co–Defendant] had been having a long dating relationship with Khadijah Freeman. He went to her home on the evening of 1/20/97 with the intent of sleeping overnight with her. When he arrived at the house, he found her bedroom door locked and he broke the door down to enter. He found her in bed with another man named [Shaheed]. There was an altercation between them. The next evening, [Co–Defendant] returned to the house and again [Co–Defendant] and [Shaheed] got into a fight. At home that evening was Khadijah Freeman's mother Ann Marie Thomas, as well as her two brothers. Khadijah testified that she did not give [Co–Defendant] any permission to enter her home on either of the two evenings. On the second episode, the deceased Ann Marie Thomas demanded that [Co–Defendant] pay for the broken door. She took $300.00 from his pocket. [Co–Defendant] then left saying that he was going to return and get [Shaheed].

[Co–Defendant] returned in 15 minutes with his friend, defendant, [Appellant] [1].

---

1. We note that in this portion of the trial court's opinion reference was made to the

He wanted to get his money back. [Appellant] drove the car [ ] and waited outside the Freeman–Thomas house as [Co–Defendant] reentered to get his money. In the meantime, Ms. Thomas had split the money with her daughter Khadijah and it was in the bureau drawer. When [Co–Defendant] returned with a gun, [Ms.] Thomas denied having the money and [Co–Defendant] placed the gun to her head and pulled the trigger. She was killed instantly. He then grabbed Khadijah and held her as he walked out to the porch. He then shot her as he climbed into the car driven by [Appellant]. They left the scene whereupon [Co–Defendant] proceeded to buy more narcotics and got high. Ms. Freeman's injuries were to the abdomen and loss of small intestines which resulted in over 25 operations to stop leakage.

Trial Court Opinion at 1–2.

¶ 3 On June 28, 1999, the jury found Appellant guilty of second-degree murder, burglary, and conspiracy. Appellant was sentenced to mandatory life in prison. This direct appeal followed.

¶ 4 Appellant raises the following issue for our review:

Was the evidence offered against the defendant at trial, even when viewed in a light most favorable to the Commonwealth as verdict winner, sufficient to sustain its burden of proving guilt beyond a reasonable doubt as to the verdicts of guilty returned by the jury for second degree murder, burglary, and criminal conspiracy.

Appellant's Brief at 4.

¶ 5 In *Commonwealth v. Hennigan,* 753 A.2d 245 (Pa.Super.2000) our Court set forth the applicable standard for assessing a challenge to the sufficiency of the evidence:

"The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Heberling,* 451 Pa.Super. 119, 678 A.2d 794, 795 (Pa.Super.1996) (citing *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994)). In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the factfinder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Cassidy,* 447 Pa.Super. 192, 668 A.2d 1143, 1144 (Pa.Super.1995) (citations omitted). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth v. Valette,* 531

---

fact that Appellant took Co–Defendant to Appellant's home to get a gun. Trial Court Opinion at 2. The Commonwealth concedes that these facts were not in evidence before the jury. Commonwealth's Brief at 5, n. 5.

Consequently, we have deleted from the Statement of Facts reference to the driving by Appellant of Co–Defendant to Appellant's home to obtain a gun.

Pa. 384, 388, 613 A.2d 548, 549 (1992) (citations and quotation marks omitted). *Commonwealth v. Vetrini,* 1999 Pa. Super 148, 734 A.2d 404, 406–407 (Pa.Super.1999). *Id.* at 253. In accordance with this standard, we consider Appellant's arguments with respect to conspiracy, burglary and second-degree murder.

¶ 6 We first delineate the statutory law that provides the framework for our analysis. Conspiracy is defined in 18 Pa.C.S.A. § 903, in relevant part, as follows:

(a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime. . . .

(e) Overt Act.—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S.A. § 903.

¶ 7 Burglary is defined in 18 Pa.C.S.A. § 3502. A person is guilty of burglary if he or she enters a building or occupied structure with the intent to commit a crime therein, unless he or she is licensed or privileged to enter. 18 Pa.C.S.A. § 3502(a). *See also, Commonwealth v. Hopkins,* 747 A.2d 910, 916 (Pa.Super.2000). 18 Pa.C.S.A. § 3502(d) provides also that "[a] person may not be convicted both for burglary and for the offense which it was his intent to commit

after the burglarious entry or for an attempt to commit that offense, unless the additional offense constitutes a felony of the first or second degree."

¶ 8 Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A § 2502(b). 18 Pa.C.S.A § 2502(d) defines perpetration of a felony as:

[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A § 2502(d) (emphasis added).

¶ 9 A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the offense. 18 Pa.C.S.A. § 306(b)(3). "Accomplice" and the "culpability of the accomplice" are defined in 18 Pa.C.S.A. §§ 306(c)(1) and 306(d).

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he: . . .

(ii) aids or agrees or attempts to aid such other person in planning or committing it; . . .

(d) Culpability of accomplice.—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S.A. §§ 306(c)(1) and 306(d).

¶ 10 With these statutory concepts in mind, we turn to the issues in this case,

*i.e.,* whether the evidence is sufficient to support convictions for conspiracy, burglary and murder of the second degree. We first focus on conspiracy.

### CONSPIRACY

¶ 11 A conviction for criminal conspiracy, 18 Pa.C.S.A. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. *Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1030 (1996), *cert. denied,* 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997), *citing* 18 Pa.C.S.A. § 903.

¶ 12 The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. *Commonwealth v. Keefer,* 338 Pa.Super. 184, 487 A.2d 915, 918 (1985). Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. *Id.* Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.,* that the Appellant was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." *Hennigan,* 753 at 253. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act. *Commonwealth v. Johnson,* 719 A.2d 778, 784 (Pa.Super.1998) (*en banc*), *appeal denied,* 559 Pa. 689, 739 A.2d 1056 (1999).

¶ 13 A conspiracy is almost always proved through circumstantial evidence. *Commonwealth v. Swerdlow,* 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994). "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Johnson,* 719 A.2d at

785. The evidence must, however, "rise above mere suspicion or possibility of guilty collusion." *Swerdlow,* 636 A.2d at 1177 (citation omitted).

¶ 14 This Court has identified factors to be considered:

> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred. *Commonwealth v. Carter,* 272 Pa.Super. 411, 416 A.2d 523 (1979).

*Commonwealth v. Olds,* 322 Pa.Super. 442, 469 A.2d 1072, 1075 (1983). *See also, Commonwealth v. Azim,* 313 Pa.Super. 310, 459 A.2d 1244 (1983).

¶ 15 Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. *Commonwealth v. Stocker,* 424 Pa.Super. 189, 622 A.2d 333, 342 (1993). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. *Commonwealth v. Soto,* 693 A.2d 226, 229–230 (Pa.Super.1997), *appeal denied,* 550 Pa. 704, 705 A.2d 1308 (1997). *See also,* 18 Pa.C.S.A. § 306.

> The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspir-

ator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

*Commonwealth v. Galindes,* 786 A.2d 1004, 1011 (Pa.Super.2001).

The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the sine qua non of a conspiracy."

*Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456, 463–464 (1998), *cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999) (citations omitted).

¶ 16 We now review the record in the light most favorable to the Commonwealth. We examine whether the record reflects that Appellant and Co–Defendant had an agreement that Appellant was to aid Co–Defendant in an unlawful act and that an overt act was committed in the furtherance of the conspiracy. In doing so, we examine Appellant's association with Co–Defendant, his presence at the scene of the crime and his participation in the crime through his assistance of Co–Defendant.

¶ 17 Initially, it is undisputed in the record that Appellant and Co–Defen-

dant have had a long and close relationship and that Co–Defendant relied on Appellant to be his driver. Appellant and Co–Defendant had been friends for several years at the time of the commission of the crimes. N.T., 6/23/99, 118. Co–Defendant did not own a car and Appellant customarily drove Co–Defendant in Appellant's automobile. N.T., 6/23/99, 117. Co–Defendant's mother testified that Appellant and Co–Defendant were together frequently and that Appellant occasionally took Co–Defendant to Co–Defendant's outpatient treatment center. N.T., 6/23/99, 117, 116. Khadijah testified that Appellant drove Co–Defendant to Khadijah's home. N.T., 6/21/99, 132. Khadijah also testified that every time she went out with Co–Defendant, Appellant always accompanied Co–Defendant. N.T., 6/21/99, 133. Khadijah stated: "[Appellant] and [Co–Defendant] go together." N.T., 6/21/99, 118. Khadijah further testified that Appellant tried to help Co–Defendant and to "look out for him." N.T., 6/21/99, 118–119. Thus, the record is clear that Appellant and Co–Defendant have had a long and close relationship and that Co–Defendant specifically relied on Appellant to be his driver.

¶ 18 Next, the record reflects that Appellant was at the scene of the crime when Co–Defendant committed the criminal acts that are the subject of this appeal. Khadijah testified that Appellant was waiting by his car when Co–Defendant brought Khadijah outside at gunpoint. N.T., 6/21/99, 93. Indeed, Appellant concedes that it is a proper inference that Appellant drove Co–Defendant back to Khadijah's home. Appellant's Brief at 17.[2] Therefore, the rec-

---

2. Appellant concedes in his brief the following:

It was a proper inference for the jury to have believed that [Appellant] had driven [Co–Defendant] back to the Freeman–Thomas home following [Co–Defendant's] earlier physical ejection. That inference may be gleaned from the fact that [Appel-

lant] stood outside in a waiting automobile when [Co–Defendant] and [Khadijah], the latter under the former's compulsion, emerged from [Khadijah's] house and the fact that the car's passenger door was open as though [Co–Defendant] had emerged from the car before entering the house. Appellant's Brief at 17–18.

ord shows that Appellant was present at the scene during the commission of the crimes.

¶ 19 We last consider Appellant's knowledge and participation in the object of the conspiracy. We first examine what the record reflects happened over the course of two consecutive evenings at Khadijah's house in order to gain an understanding of surrounding circumstances of the crimes in question.

¶ 20 The record reflects that Co–Defendant had been involved in three "break-ins" of Khadijah's home over the course of two consecutive nights. On the first night, Co–Defendant entered Khadijah's home without permission by breaking in the front door with enough force to break the lock off the front door. N.T., 6/21/99, 89. Co–Defendant then entered Khadijah's room and lay on the bed beside her. *Id.* When Khadijah awoke, she yelled. *Id.* Co–Defendant and Khadijah's boyfriend, Shaheed, engaged in a fistfight. *Id.* Co–Defendant and Shaheed then both left Khadijah's house. *Id.*

¶ 21 The next night, two "break-ins" occurred. The first "break-in" occurred when Co–Defendant entered Khadijah's home without permission as he had the previous night. N.T., 6/21/99, 90. Khadijah testified that the door was already broken. *Id.* Khadijah further stated that upon entry, Co–Defendant went to Khadijah's bedroom and entered her bed. N.T., 6/21/99, 90. Another fight ensued between Co–Defendant and Shaheed. N.T.,

6/21/99, 90, 109. While Co–Defendant was on the ground, Khadijah's mother, Ms. Thomas, pulled approximately $300.00 from Co–Defendant's pocket to pay for the door that had been broken the night before. N.T., 6/21/99, 90, 110. Co–Defendant fled the house, saying he was "going to get Shaheed." N.T., 6/21/99, 90. Shaheed also left the house and told Khadijah to lock the door. N.T., 6/21/99, 91, 111. Khadijah then went to the front door and pushed a single livingroom chair in front of the door, N.T., 6/21/99, 91, 97, 136. Khadijah went back upstairs to her mother's bedroom, which was on the street side of the house. N.T., 6/21/99, 91.

¶ 22 The third "break-in" (the second "break-in" on the same night and the "break-in" that is the subject of Appellant's case) occurred fifteen minutes after Co–Defendant left Khadijah's house when Co–Defendant returned to her house with a gun. N.T., 6/21/99, 91, 112. Appellant drove Co–Defendant to Khadijah's house.[3] Appellant double-parked his car on the street directly in front of Khadijah's home. N.T., 6/21/99 at 94. The passenger door of Appellant's car remained open. *Id.* Appellant stood on the street on the driver's side of Appellant's car waiting for Co–Defendant. *Id.* The place where Appellant was standing was very close in proximity to the front porch of Khadijah's house. *Id.,* at 121. *See,* Commonwealth Exhibits, C–1, C–3, C–9, C–11.[4]

¶ 23 Co–Defendant broke into Khadijah's home by breaking in the door with

**3.** As stated in footnote 2, Appellant concedes that it was a proper inference for the jury to have believed that Appellant drove Co–Defendant to the crime scene. Appellant's Brief at 17.

**4.** The record contains photographic evidence of the front and exterior of Khadijah's home. This evidence reveals the extremely close proximity of the home to the street. The photographs depict a low and shallow front

porch. The second floor front bedroom windows extend over the roof of the front porch. There is no front yard. Rather, the edge of the front porch abuts the narrow public sidewalk, which runs along the street. The steps exiting the front porch lead directly onto the public sidewalk. Cars park in the narrow street along the sidewalk in front of the home. *See,* Commonwealth Exhibits, C–1, C–3, C–9, C–11.

enough force to move the chair barricade. N.T., 6/21/99, 91, 136, 137. Khadijah testified that this entrance caused even more damage to the front door than Co–Defendant's previous entries had caused. N.T., 6/21/99, 134, 135. Photographs presented to the jury show that the door was in a mangled condition, pieces of wood were on the floor and the doorjamb was damaged as the chain had been pulled out from the screws. N.T., 6/21/99, 53–74. *See,* Commonwealth Exhibits, C–3, C–4, C–9, C–10, C–14.

¶ 24 Co–Defendant brandished a gun when he went upstairs, pushed Ms. Thomas' bedroom door open and demanded his "f——ing money." N.T., 6/21/99, 91, 113–114. When Ms. Thomas stated she did not have the money, Co–Defendant pointed the gun at Ms. Thomas' head and shot her in the forehead.[5] N.T., 6/21/99, 91, 92, 115. Ms. Thomas's bedroom was located in the front of the house and faced the street in very close proximity as the windows of the bedroom extended over the roof of the front porch. N.T., 6/21/99, 93, 59–60. *See,* Commonwealth Exhibit, C–1.

¶ 25 Co–Defendant then put a gun to Khadijah's side and demanded his money from her. N.T., 6/21/99, 92, 93, 115. Khadijah and Co–Defendant went to her bedroom and took his money from her dresser drawer. *Id.* Co–Defendant then took Khadijah, with the gun pointed at her side, down the stairs, outside to the front porch and onto the sidewalk. *Id.*

¶ 26 When Appellant observed that Co–Defendant and Khadijah were outside of Khadijah's home, Appellant called to Co–Defendant and urged him to "come on" at least three or four times. N.T., 6/21/99, 92, 93, 94, 127–128. Co–Defendant released Khadijah and, as Co–Defendant entered the passenger side of Appellant's

waiting car, Co–Defendant turned and shot Khadijah. N.T., 6/21/99, 92, 93, 94. The bullet entered Khadijah's right side, causing serious internal injuries which required over thirty surgeries. N.T., 6/21/99, 81–86. Appellant drove Co–Defendant from the scene. N.T., 6/21/99, 95.

¶ 27 We now examine whether the record reflects a sufficient "web of evidence" to support the jury's determination that Appellant is guilty of criminal conspiracy beyond a reasonable doubt. *See, Johnson,* 719 A.2d at 785. The circumstantial evidence reflects that Appellant and Co–Defendant had a shared criminal plan of committing a burglary at Khadijad's house. The plan contemplated a quick getaway as evidenced by Appellant keeping his car double-parked very close to the front door of the house with the passenger door in an open position.

¶ 28 The plan contemplated the use of unlawful force as evidenced by what Appellant did while Co–Defendant used such force. The record reflects the front door of Khadijad's house was very close to the street where Appellant was standing outside of his car door.[6] Appellant observed Co–Defendant breaking down the front door and entering the home without the occupants' consent. The record does not reflect that Appellant said or did anything. Rather, the record reflects that Appellant simply stood outside of his double parked car, with the passenger door in an open position, and waited for Co–Defendant to enter and, then, to return. After the gun was shot, fatally wounding Ann Marie Thomas, the record again fails to reflect that Appellant said or did anything. Rather, Appellant remained outside of his car and waited for Co–Defendant to return. When Co–Defendant dragged Khadijah out of the house, Appellant encouraged

---

5. Ms. Thomas was three months pregnant at the time she was murdered. N.T., 6/22/99, 62.

6. *See,* note 4, *supra.*

Co–Defendant at least three times to hurry up. When Co–Defendant shot Khadijah, the record fails to reflect that Appellant did anything to assist Khadijah. Rather, Appellant drove Co–Defendant away from the scene of the crime.

¶ 29 This "web of evidence" is woven together by virtue of Appellant's close association with Co–Defendant, Appellant's knowledge of the crime, Appellant's presence at the scene of the crime and Appellant's participation in the object of the conspiracy by supporting Co–Defendant in his commission of the burglary. Thus, the evidence is sufficient to support a jury's conclusion beyond a reasonable doubt that Appellant and Co–Defendant engaged in a criminal conspiracy to commit burglary, *i.e.*, what Co–Defendant and Appellant did was in accordance with a shared criminal intent and shared criminal plan to commit a burglary.

¶ 30 Finally, we address whether an overt act was committed in furtherance of the conspiracy. Appellant himself did not have to commit the overt act, in order for the overt act to be considered an element of the conspiracy. 18 Pa.C.S.A. § 903(e). The Commonwealth may prove the element of an overt act by proving that the person with whom Appellant conspired committed the act "in pursuant of such conspiracy." 18 Pa.C.S.A. § 903(e).

*Johnson, supra,* 719 A.2d at 785. Our review of the record reflects sufficient circumstantial evidence of an overt act for the conspiracy to commit burglary, *i.e.,* the breaking in of the front door by Co–Defendant. A jury could, therefore, conclude beyond a reasonable doubt that Appellant and Co–Defendant shared a common understanding that one of them would actually commit the act of a burglary of Khadijah's home.

■ ¶ 31 Now, we address Appellant's various contentions respecting his conspiracy convictions. Appellant first contends that he did not share the criminal intent with Co–Defendant because he was unaware that Co–Defendant had forced his way into the home. The record belies his claim. The car beside which Appellant was standing was double-parked directly in front of the house. The front door of the house almost abutted the front public sidewalk, which was a few feet away from the car where Appellant stood. Great damage was inflicted on the front door as a result of Co–Defendant's breaking in of the door in order to move the chair barricade. A jury could conclude beyond a reasonable doubt that Appellant was aware that Co–Defendant had forced his way into the home and had fired a gun and, thus, shared Co–Defendant's criminal intent to commit burglary.[7]

---

**7.** We limit our review to a shared criminal intent for the crime of burglary. Appellant also contends that he was unaware that Co–Defendant had shot Ann Marie Thomas. We need not determine here whether a shared criminal intent existed for murder as that is not before us. We do observe, however, that the record reflects that the bedroom where Co–Defendant shot Ann Marie Thomas was located in the front of the house facing the sidewalk near where the car was parked. A jury could reasonably conclude that Appellant was aware that Co–Defendant had fired a gun in the bedroom.

Appellant also argues that "[t]here is no evidence that [he] knew that the shot that

[Co–Defendant] had discharged had struck Khadijah before he drove his car off." Appellant's Brief at 19. We need not determine here whether a shared criminal intent existed for aggravated assault as that is not before us. We do observe, however, that the record reflects that Co–Defendant shot Khadijah as he was getting into the passenger side of Appellant's vehicle. The gunshot would not have gone undetected by one so physically close to the assault. A medical expert testified that Khadijah suffered extensive injuries as the bullet entered Khadijah's chest on the side and transected across her abdomen, injuring her lung, her liver, her colon, her pancreas, and her intestine N.T., 6/21/099, 83. Khadijah testified that she collapsed to the sidewalk

¶ 32 Next, Appellant contends that he was "merely present" when the crimes occurred. Appellant's Brief at 22. He relies on *Commonwealth v. Menginie,* 477 Pa. 156, 383 A.2d 870 (1978), *Commonwealth v. Kennedy,* 271 Pa.Super. 206, 412 A.2d 886 (1979), *affirmed in part, reversed in part,* 499 Pa. 389, 453 A.2d 927 (1982), and *Commonwealth v. Johnson,* 355 Pa.Super. 372, 513 A.2d 476 (1986). As the following reflects, the initial criminal act in each of these cases was spontaneous and independent of the defendant. Thus, these cases are not helpful to Appellant.

¶ 33 A spontaneous, unplanned act by a passenger was at question in *Menginie, supra.* The occupants of two cars became involved in a dispute while moving toward the service window of a drive-in restaurant. *Id.,* at 871–872. Without warning, a passenger from defendant's car suddenly exited the car, produced a gun and fired a shot, fatally wounding the victim in the other car. *Id.* at 872. The defendant and his passengers immediately drove away. *Id.* Our Supreme Court held that the evidence did not support an inference of an unlawful agreement to kill between Appellant and the shooter. *Id.* Rather, the Court concluded, the evidence lacked any inference of an unlawful agreement. *Id.,* at 872–873.

¶ 34 A spontaneous assault on a victim by a defendant's friend was at issue in *Kennedy, supra.* There, defendant's friend argued with the victim and, when the friend struck the victim, a fight ensued and defendant then joined in the beating. *Id.,* at 928. Our Supreme Court stated that these events were consistent with the conclusion that defendant and the other assailant acted "independently and sponta-

neously" rather than in concert with one another (for purposes of a conspiracy). *Id.,* at 930.

¶ 35 The defendant's role as a bystander was at question in *Johnson, supra.* The defendant was standing with a group of patrons in front of a bar when the victim rode by on a bicycle. *Id.* at 477. One of the patrons uttered, "Here comes a white boy. Let's get him." *Id.* Another patron then pulled out a revolver and shot the victim twice. *Id.* Our Court held that the evidence showed the appellant, as a bystander, was merely present at the scene of the crime. *Id.* at 478.

¶ 36 Appellant was not "merely present" at the scene as his actions were not spontaneous and not independent of Co–Defendant. Here, unlike *Menginie,* the jury concluded that Appellant drove Co–Defendant to Khadijah's home for a single purpose, *i.e.,* so that Co–Defendant could burglarize Khadijah's home. Appellant remained until Co–Defendant had completed the plan, and then drove him away. Here, unlike *Kennedy,* Appellant's prior close relationship with Co–Defendant, including his services as a driver as well as his actions during the commission of the crimes, support the jury's conclusion that Appellant and Co–Defendant were engaged in concerted, not spontaneous and independent, activity. Here, unlike *Johnson,* the jury concluded that Appellant was an active participant at the scene of a crime in the criminal plan (and not a mere bystander). Appellant's argument that he was merely present at the scene of the crime under the authority of *Menginie, Kennedy* and *Johnson* fails. In summary, the evidence is sufficient to support the

after Co–Defendant shot her. N.T., 6/21/99, 96, 127. The jury could easily have inferred

that Appellant knew the victim had been shot.

jury's verdict with respect to Appellant's conviction for conspiracy.

## BURGLARY

 ¶ 37 The next question is whether the evidence is sufficient for Appellant's conviction of burglary. Again, a person is guilty of a burglary if he enters an occupied structure with the intent to commit a crime therein and without license or privilege to enter. 18 Pa.C.S.A. § 3502(a). The intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. *Commonwealth v. Alston,* 539 Pa. 202, 651 A.2d 1092, 1094 (1994). While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. *Id.* Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. *Id.,* 651 A.2d at 1095. The Commonwealth is not required to allege or prove what particular crime a defendant intended to commit after his forcible entry into the private residence. *Id.* Again, a co-conspirator is criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. *Soto.*

¶ 38 Here, as discussed in more detail above, the record reflects Co–Defendant forcibly "entered" into a private occupied structure, Khadijah's residence, without license or privilege and through force strong enough to shatter the door and its frame into wood shards. These actions permit the inference that Co–Defendant intended a criminal purpose. *Alston.* As co-conspirator, Appellant was responsible for the actions of Co–Defendant taken in furtherance of the conspiracy, *i.e.,* the burglary. *Soto.* Thus, the evidence was sufficient for a jury to convict Appellant of burglary.

## MURDER OF THE SECOND DEGREE

 ¶ 39 The final question is whether the evidence is sufficient to establish beyond a reasonable doubt the conviction of second-degree murder. Here, Appellant specifically argues that the evidence does not support a finding that the killing was committed in furtherance of the commission of the felony. Appellant's Brief at 30.

 ¶ 40 Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A § 2502(b). 18 Pa.C.S.A § 2502(d) defines perpetration of a felony as:

> [t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A § 2502(d) (emphasis added). *Commonwealth v. Gladden,* 445 Pa.Super. 434, 665 A.2d 1201, 1209 (1995) (*en banc*), *appeal denied,* 544 Pa. 624, 675 A.2d 1243 (1996). The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim. *Commonwealth v. Mikell,* 556 Pa. 509, 729 A.2d 566, 569 (1999); *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833, 855 (1985), *cert. denied,* 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986).

¶ 41 The elements of accomplice liability for felony murder were addressed in *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841, 848 (1983):

> In *Commonwealth v. Waters,* 491 Pa. 85, 95, 418 A.2d 312, 317 (1980), the court discussed the elements to be proved in

order to establish accomplice liability for felony murder, saying that:

> ... [t]he responsibility of persons, other than the slayer, for a homicide committed in the perpetration of a felony require[s] proof of a conspiratorial design by the slayer and the others to commit the underlying felony and of an act by the slayer causing death which was in furtherance of the felony. See e.g. *Commonwealth v. Allen* [475 Pa. 165, 379 A.2d 1335], [ ]; *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Williams,* 443 Pa. 85, 277 A.2d 781 (1971); *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472 (1958). *Cf. Commonwealth v. Schwartz,* 445 Pa. 515, 285 A.2d 154 (1971). (footnote omitted) (emphasis in original).

Moreover, it was stated by the court in *Commonwealth v. Legg,* 491 Pa. at 82, 417 A.2d at 1154:

> When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact the actor was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known that death might result from the felony. (footnote omitted)

*Middleton,* 467 A.2d at 848. *See also, Commonwealth v. Johnson,* 336 Pa.Super. 1, 485 A.2d 397, 401 (1984). In *Commonwealth v. Melton,* 406 Pa. 343, 178 A.2d 728, 731 (1962), *cert. denied,* 371 U.S. 851, 83 S.Ct. 93, 9 L.Ed.2d 87 (1962), our Supreme Court explained that not only the killer, but all participants in a felony, including the getaway driver, are equally guilty of felony murder when a killing by a felon occurs.

¶ 42 The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. *Commonwealth v. Laudenberger,* 715 A.2d 1156, 1160 (Pa.Super.1998). The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. *Middleton,* 467 A.2d at 848; *Johnson,* 485 A.2d at 401. It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. *Id.* Rather, the fact finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking. *Middleton,* 467 A.2d at 848.

¶ 43 Here, Appellant does not argue that the killing of Ms. Thomas was not foreseeable. Rather, Appellant claims that the killing was not in furtherance of the burglary.

¶ 44 Our review of the record reflects that Co-Defendant was involved in the perpetration of a burglary, an enumerated felony in 18 Pa.C.S.A. § 2502(d), when the killing of Ann Marie Thomas occurred. Appellant served as an accomplice to the commission of the burglary. Appellant drove Co-Defendant to the scene of the crime, waited during the commission of the crime and facilitated the flight afterwards. The malice from the burglary is imputed to the killing to make it murder of the second-degree, regardless of whether Appellant actually intended to physically harm the victim. *Mikell.* The jury determined, as was its right, that the killing was in furtherance of the conspiracy. It is immaterial whether Appellant actually ex-

pected Ms. Thomas' death in furtherance of the conspiracy. *Middleton, Johnson.* Nor can it be said that the murder was merely a coincidence. Appellant knew, or should have known, that the possibility of death to one of the occupants of the house accompanied the dangerous undertaking of a burglary. *Id.* Appellant's claim is meritless.

¶ 45 As explained above, once a conspiracy has been proven, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. *Stocker.* Thus, Appellant is criminally liable for the actions of his co-conspirator, Co–Defendant, taken in furtherance of the conspiracy. *Soto.* Thus, since the evidence was sufficient to establish beyond a reasonable doubt that Appellant was guilty of conspiracy to commit burglary, he is liable for the acts of his co-conspirator, Co–Defendant, that were committed in furtherance of the conspiracy, *i.e.,* the murder of Ms. Thomas.

## ACCOMPLICE LIABILITY

 ¶ 46 We also observe that Appellant was independently liable, as an accomplice, for second-degree murder and burglary. As stated above, an accomplice is someone who, "with the intent of promoting or facilitating the commission of the offense aids or agrees or attempts to aid [another person] in planning or committing" the crime. 18 Pa.C.S.A. § 306(c)(1)(ii). *See also, Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279, 1286 (1996).

> The very nature of accomplice liability is that one who actively and purposefully engages in criminal activity is criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor. However, in order to impose this form of criminal liability the individual "must be an active partner in the intent to commit [a crime]." Further,

an accomplice "must have done something to participate in the venture." Lastly, "mere presence at the scene is insufficient to support a conviction: evidence indicating participation in the crime is required." Most importantly, the law requires some proof that a party was an active participant in a criminal enterprise in order to impose accomplice liability. Such a finding cannot be based upon mere assumption or speculation.

> In *Commonwealth v. Garrett,* 423 Pa. 8, 222 A.2d 902 (1966), our Supreme Court stated:

> Appellant's presence on the scene, both immediately prior and subsequent to the commission of the crime, was established. This fact, however, in the absence of other evidence indicative of appellant's participation in the robbery, did not warrant submission of the case to the jury.

*Commonwealth v. Vining,* 744 A.2d 310, 321 (Pa.Super.1999) (*en banc*) (citations omitted).

 ¶ 47 Here, for the reasons discussed above, the evidence was sufficient to support a jury's conclusion beyond a reasonable doubt that regardless of the existence of any formal or informal agreement, Appellant aided Co–Defendant in the commission of his crimes. Appellant drove Co-defendant to the scene, waited outside while Co–Defendant broke down the front door and found his victims, urged his partner to "come on," witnessed Co–Defendant shoot Khadijah, and then drove him away. Thus, Appellant was more than merely present at the scene of the crime because the evidence indicates Appellant participated in it as an accomplice. Therefore, as an accomplice, Appellant was legally responsible for Co–Defendant's crimes.

¶ 48 Appellant argues that his case is "remarkably similar" to the case of *Com-*

*monwealth v. Brady,* 385 Pa.Super. 279, 560 A.2d 802 (1989). In *Brady,* the defendant sat as a passenger in a car while the driver of the vehicle left the vehicle, entered a residential dwelling through a window, removed personal property, and placed the property in the trunk of the car. On this evidence, a jury found the defendant guilty of burglary but not guilty of conspiracy to commit burglary. Our Court reversed the defendant's burglary conviction because there was no evidence that the defendant exited the car or assisted the driver during these events and because the driver of the car testified that the defendant had not participated in the burglary in any way. Accordingly, the evidence was insufficient to show that the defendant was an accomplice. *Brady,* 560 A.2d at 806.

¶ 49 In Appellant's case, the record supports a conclusion that Appellant was an accomplice to Co–Defendant and his commission of burglary. Here, unlike *Brady,* Appellant drove the car, in which Co–Defendant rode, to Khadijah's home. Appellant was physically close to the door that Co–Defendant broke down. Appellant stood on the driver's side of the car, with the passenger door wide open, and called for his partner to return to the getaway car to enable a quick escape after the house had been burglarized. The evidence is sufficient to show that Appellant aided Co–Defendant in the commission of the burglary. Since Appellant was an "active participant" in the "criminal enterprise," he was criminally responsible for the criminal actions of his Co–Defendant which were committed in furtherance of the criminal endeavor. *Vining.* The evidence proves Appellant was legally responsible for the commission of the crimes as an accomplice. Appellant's argument to the contrary fails.

¶ 50 Summarizing, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence is sufficient to uphold the Appellant's convictions of conspiracy, burglary, and second-degree murder.

¶ 51 Judgment of sentence affirmed.